UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| CENTURY INDEMNITY COMPANY,<br><br>    Plaintiff,<br><br>    v.<br><br>MATSON TERMINALS, INC., et al.,<br><br>    Defendants. | Case No.  14-cv-01972-LB<br><br>**ORDER ON SUMMARY-JUDGMENT MOTIONS**<br><br>[Re: ECF Nos. 38, 53] |

## INTRODUCTION

The parties disagree over whether Century Indemnity Company must indemnify the Matson defendants under an excess-coverage insurance policy. That policy commits Century to reimbursing Matson for amounts that the latter paid "because of . . . compensation or other benefits" that Matson was "required" to pay "by the workers' compensation law." Federal labor law required Matson to pay yearly assessments into a Special Fund that, among other things, compensates workers who have suffered successive disabling injuries. The annual assessment is based partly on how many Matson employees the Fund compensated in the prior year. The court must now decide, on the parties' competing motions for summary judgment, whether the Century policy covers the Special Fund assessments. Century also argues that the statute of limitations bars Matson's claims. For the reasons stated below, the court grants Matson's motion for partial

summary judgment, denies Century's, and holds that the policy covers the disputed assessments.[1]

## I. THE ACT AND THE SPECIAL FUND

"The Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901, *et seq.,* (the 'LHWCA' or 'Act') establishes a detailed and comprehensive workers' compensation scheme for maritime employees." *Nat'l Metal & Steel Corp. v. Reich*, 858 F. Supp. 62, 62 (D. Md. 1994), *aff'd,* 55 F.3d 967 (4th Cir. 1995). "The LHWCA requires every employer to secure the payment of compensation to its employees for injuries arising during the course of employment." *Reich*, 858 F. Supp. at 63 (citing 33 U.S.C. § 904). "Every employer must secure the payment of compensation by insuring such payment with a company that is authorized by law to insure workers' compensation, also known as a 'carrier,' or by receiving authorization from the Secretary [of Labor] to pay such compensation directly, thereby becoming a 'self-insurer.'" *Reich*, 858 F. Supp. at 63 (citing 33 U.S.C. § 932(a)(1)-(2)).

"A subset of these compensable injuries is assumed by a [statutorily created] Special Fund, which relieves employers of liability for a portion of compensation payments when employees with preexisting disabilities suffer 'second injuries.'" *Reich*, 858 F. Supp. at 63 (citing 33 U.S.C. § 908(f)). "The Special Fund is intended to encourage employers to hire employees with preexisting disabilities." *Reich*, 858 F. Supp. at 62. It does this "by spreading the risk of loss throughout the industry." *Reich*, 55 F.3d at 969. "Funding for the Special Fund depends principally on assessments that the United States Secretary of Labor . . . imposes on 'each carrier and self-insurer' covered by the Act." *Reich*, 858 F. Supp. at 62 (citing 33 U.S.C. § 944(c)(2)). In addition to disability compensation, the Special Fund pays for vocational rehabilitation, and provides workers with information about the Special Fund. *See* 33 U.S.C. §§ 944(i), 908(g), 939(c).

---

[1] Century's predecessor was the Insurance Company of North America, or "INA." Matson bought the disputed policy from INA. The parties, the record evidence, and the court thus sometimes discuss "INA." For present purposes, there is no legally significant distinction between INA and Century. All references to INA can be understood to refer to Century.

## II. SPECIAL FUND ASSESSMENTS: BEFORE AND AFTER 1984

No worker can receive Special Fund compensation without the Department of Labor's approval. *See generally* 20 C.F.R. § 702.321. (The decisions approving the relevant Matson employees appear at ECF Nos. 39-6 to -18.[2]) Once a worker enters the Special Fund, the LHWCA requires the employer (or its insurance carrier) to pay the first 104 weeks of disability compensation directly to the employee; after that, the Special Fund takes over. *See Reich*, 55 F.3d at 969 (citing 33 U.S.C. § 908(f)). An employer's obligation does not evaporate at 104 weeks, however. Should the employer fail to pay its compulsory Special Fund assessments, it would again be liable for directly compensating its injured workers. *See Reich*, 858 F. Supp. at 64 (citing 33 U.S.C. § 908(f)(2) ("The Special Fund shall not assume responsibility . . . for compensating an injured employee whose employer fails to secure the payment of compensation.")).

When the INA policy became effective in 1980, and until 1984, mandatory assessments into the Special Fund were calculated under a single formula. This "Part A" formula determined any given employer's yearly assessment as the ratio "of the total amount of [direct] compensation that each [employer] paid during the prior calendar year to the total amount of compensation that all [employers] paid during that period." *Reich*, 858 F. Supp. at 64 n. 4 (citing 33 U.S.C. § 944(c)(2)). This ratio was then multiplied by the Special Fund's projected total compensation for the next year. For example, if an employer paid (itself or through an insurance carrier) 5% of the maritime industry's total direct workers'-compensation benefits in a given year, it would be assessed 5% of the next year's projected Special Fund expenditures. This was regardless of how many of the company's workers were receiving Special Fund compensation. The Part A calculation thus depended entirely on how much the employer and industry had paid in direct compensation to injured workers *outside* the Special Fund.

Because it was not keyed to how many workers a company had put into the Special Fund, or

---

[2] The court grants Matson's unopposed request to take judicial notice of these decisions, the policy, and supporting legal material. (*See* ECF No. 39.)

(more precisely) how much the Special Fund had paid out to that company's workers, the Part A method encouraged abuse. Companies shunted an excessive number of their workers into the Special Fund; they "thereby decreased their payment of direct compensation to injured employees without increasing their [Special Fund] assessment rate." *Reich*, 858 F. Supp. at 64 n. 3. "In fact, 'dumping' cases into the Special Fund actually decreased an employer's assessment rate by decreasing the amount of its direct compensation." *Id.* This caused "dramatic growth [in] the Special Fund's obligations" to "second injury" workers. *Id.*

To solve this problem, in 1984 Congress changed the method for calculating Special Fund assessments. *Id.* The existing Part A formula would now yield only one part of an employer's yearly assessment. A new "Part B" calculation (33 U.S.C. § 944(c)(2)(B)) would account for the other part. Unlike Part A, the new Part B formula did account for how many workers a given employer had put into the Special Fund; or, more correctly, Part B set part of an employer's assessment according to how much the Special Fund had paid *that employer's* workers in the prior year. *See Reich*, 858 F. Supp. at 64 n. 4 (citing 33 U.S.C. § 944(c)(2)).[3] The Part B assessments thus, for the first time, linked a company's Special Fund obligations to the compensation that its own workers had received from the Fund.

\* \* \*

### III. THE PARTIES AND THE DISPUTED POLICY

Matson operated primarily as a self-insurer. (ECF No. 38 at 11.) To cover its obligations under the Act that surpassed a certain dollar limit, Matson bought from Century's predecessor (INA) an excess-coverage insurance policy. Entered into in 1979, the policy originally covered the 1980 calendar year; the parties later extended it to cover 1981. (*See* Policy – ECF No. 39-1 at 2, 25; ECF No. 38 at 11.) Coverage under the policy could be triggered if Matson's outlays for any one worker exceeded $250,000. (ECF No. 39-1 at 3 (declarations); Compl. – ECF No. 2 at 5-6, ¶ 29.)

---

[3] To be exact, the Part B segment of a yearly assessment is calculated as follows: {[(Special Fund compensation disbursed to Company X's employees in prior year) / (total Special Fund compensation disbursed industry-wide in prior year)] x [50% of Special Fund's total estimated compensation payments]}. *See* U.S.C. § 944(c)(2).

The policy's basic coverage clause provides:

> INA hereby agrees to indemnify the Insured against excess loss as a result of injury (1) by accident occurring during the policy period . . . subject to the limitations, conditions and other terms of this policy, which the Insured may sustain ***because of***: (a) ***compensation and other benefits required of the Insured by the workers' compensation law*** . . . .

(ECF No. 39-1 at 4 (emphasis added) (formatting altered).) The policy's basic "Insuring Agreements" further provide that Century will be liable for only Matson's "ultimate net loss" in excess of $250,000 for any one worker. (*Id.*) Elsewhere, the policy's "Definitions" section defines "ultimate net loss" as "the sum actually paid in cash in the settlement or satisfaction of losses for which the Insured is liable, either *by adjudication* or compromise with the written consent of INA . . . ." (*Id.* at 5 (emphasis added).) Finally, the policy is an "occurrence" rather than a "claims made" policy; it covers injuries that occurred during the policy's effective period (from January 1, 1980 until January 1, 1982). (*See* ECF No. 39-1 at 2, 4.)

The parties actively negotiated parts of the policy. Two, at least, figure into the parties' arguments. First, the parties negotiated Part II of the core Insuring Agreements. This Part II limited Century's liability to Matson's "ultimate net loss." (ECF No. 39-1 at 4, ¶ II(a).) Part II did not define "ultimate net loss," however (*see id.*); the policy's separate "Definitions" section did that (*id.* at 5, ¶ 4(e)). It is the *definition* that, in explaining what constitutes "ultimate net loss," restricts coverage to "losses" that Matson sustains "by adjudication." (*Id.*) Correspondence from 1980 between INA and Matson's lawyers indicates that INA had proposed an "amended" Part II; Matson rejected this and the parties fell back on INA's standard-form language for Part II. (*See* ECF No. 54-1 at 2-6 (correspondence reflecting negotiations); ECF No. 53 at 12 ("the insuring agreement . . . used form language"). The correspondence does not show any negotiation over the definition of "ultimate net loss" or its limitation to losses sustained "by adjudication." (*See* ECF No. 54-1, *passim*.)[4]

---

[4] Matson objects to the correspondence that Century submitted to show the parties' negotiations. (ECF No. 55 at 19-20 and n. 8.) Matson complains that the evidence was late (Century attached it only to its reply brief), irrelevant, and potentially hearsay. For present purposes, the court overrules Matson's objections as effectively moot. Even considering this evidence, as the Analysis below will show, the court does not agree with Century that the parties' negotiations compel a policy reading that would deny Matson coverage. For the reasons that Century sets out (*see* ECF No. 58), the court also grants

Second, apparently at Matson's urging, the parties added "Endorsement 7 to the policy. The precise language of this endorsement is not material to this analysis. The gist of Endorsement 7 is enough for present purposes. The endorsement mainly addresses subrogation rights that may arise against the Matson parent company — and, specifically, such rights as may arise between related Matson entities. For example, should Century become subrogated to a Matson subsidiary's right against the Matson parent, then under Endorsement 7, Century must assign that right to the Matson parent. (ECF No. 39-1 at 22-23.)

\* \* \*

### IV. MATSON'S 2013 CLAIMS AND CENTURY'S DENIAL

It was not until 2013 that Matson first made claims under the policy for losses consisting in Part B assessments to the Special Fund. It then sought coverage for Part B assessments that it had paid on 13 Matson employees "who suffered disabling injuries during the INA Policy period." (ECF No. 38 at 13; Compl. – ECF No. 2 at 8-9, ¶¶ 43-45.) The payments in question date from 1984. (*See* Compl. – ECF No. 2 at 8, ¶¶ 43-44.) In October 2013, Century denied Matson's claim. (*Id.* at 10, ¶¶ 55-56.)

\* \* \*

This brings us to the present motions. The parties do not dispute the nature, function, or history of the Special Fund or its assessment formulas. They do not dispute employers' general workers'-compensation obligations under the LHWCA. Their present disagreement concerns only whether the Century policy covers the Part B assessments that Matson made into the Special Fund. On that isolated issue of coverage, the parties bring crossing motions for summary judgment.

\* \* \*

Century's request for judicial notice of this and related material. (ECF No. 54.)

1                                           **ANALYSIS**

2       The court must grant a motion for summary judgment if the movant shows that there is no

3 genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of

4 law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material

5 facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about

6 a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for

7 the non-moving party. *Id.* at 248-49.

8       Federal courts sitting in diversity jurisdiction apply the contract law of the forum state. *See,*

9 *e.g., Gasperini v. Ctr. for Humanities, Inc.,* 518 U.S. 415, 419, 427 (1996). The Supreme Court of

10 California has set out the rules that govern the judicial interpretation of insurance policies. "Under

11 statutory rules of contract interpretation, the mutual intention of the parties at the time the contract

12 is formed governs interpretation." *AIU Ins. Co. v. Superior Court of Santa Clara County*, 51

13 Cal.3d 807, 821-22 (1990) (citing Cal. Civ. Code § 1636). "Such intent is to be inferred, if

14 possible, solely from the written provisions of the contract." *AIU*, 51 Cal.3d at 822 (citing Cal.

15 Civ. Code § 1639). "The 'clear and explicit' meaning of these provisions, interpreted in their

16 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning

17 is given to them by usage' controls judicial interpretation." *AIU*, 51 Cal.3d at 822 (internal

18 citations omitted) (citing Cal. Civ. Code §§ 1638, 1644). "Thus, if the meaning a lay person would

19 ascribe to contract language is not ambiguous, we apply that meaning." *AIU*, 51 Cal.3d at 822

20 (citing cases). "In the insurance context," moreover, California courts "generally resolve

21 ambiguities in favor of coverage." *Id.* Similarly, those courts "generally interpret the coverage

22 clauses of insurance policies broadly, protecting the objectively reasonable expectations of the

23 insured." *Id.*; *accord, e.g., Bk. of the West v. Superior Court of Contra Costa County*, 2 Cal.4th

24 1254, 1264-65 (1992) (ambiguous terms construed to protect "the objectively reasonable

25 expectations of the insured").

26                                       \*   \*   \*

27

28

# I.  THE POLICY'S PLAIN LANGUAGE COVERS THE SPECIAL FUND ASSESSMENTS

## A.  Core Analysis

The plain language of the policy covers the Part B assessments that the LHWCA required Matson to pay to the Special Fund. This conclusion requires nothing more than applying the plain meaning of the relevant terms in light of the undisputed facts. The policy's operative language, again, promised coverage for "excess loss" that Matson sustained "because of . . . compensation and other benefits" that it was "required" to pay "by the workers' compensation law." (ECF No. 39-1 at 4.) The policy's Ultimate Net Loss term (so far as is relevant) further required that Matson's obligation to pay arose "by adjudication." (*Id.* at 5, ¶ 4.e.)

The parties do not dispute that financial expenditures, if otherwise within the scope of these terms, constitute "losses." Nor do they disagree that the LHWCA "required" Matson to pay the Part B assessments. Straightforward reasoning shows that Matson was "required" to pay the assessments "because of . . . compensation" or "other benefits" that the Special Fund disbursed to Matson employees. It is undisputed that the Part B assessments were calculated based on how much the Special Fund had paid to Matson employees in the prior year. It is also undisputed that, had Matson not discharged its responsibility to compensate its injured workers by paying assessments into the Special Fund, then it would have remained liable for compensating its workers directly, outside the Special Fund. The Part B assessments, in other words, were tied to, and arose "because of," the "compensation" and "other benefits" that the LHWCA "required" Matson to pay its injured workers. Finally, the assessments were made after Department of Labor ("DOL") determinations that injured Matson workers were eligible for Special Fund payments. *See* 20 C.F.R. § 702.321. Without a DOL determination, no Matson employee could have entered the Special Fund, and Matson would have had no assessment to pay under Part B. Those assessments were thus triggered "by adjudication[s]" within the meaning of the policy's "ultimate net loss" term.

*  *

### B. Century's Arguments

#### 1. The assessments were not "compensation"

Century offers several arguments for why its policy does not cover the Part B assessments. It first writes that, in seeking coverage, Matson "starts from the fundamentally false premise that" the Part B assessments "are *indirect* payments of compensation to the 13 Claimants." (ECF No. 57 at 4 (emphasis in original).) This cannot be right, Century argues; "Matson's compensation obligation to the 13 Claimants ceased after 104 weeks." (*Id.*)

This argument harbors several errors. First, what ended at 104 weeks was Matson's obligation to pay its injured workers directly — provided, that is, that those workers were then enrolled in the Special Fund, which would provide subsequent compensation. If such workers did not enter the Special Fund, or if Matson failed to pay its Special Fund assessments, then Matson's obligation to compensate them directly would continue after the initial 104 weeks. (The parties do not dispute the latter point.) It is therefore inaccurate to say simply that "Matson's compensation obligation ceased after 104 weeks." Matson's compensation obligation continued; it is merely that, after 104 weeks, Matson could pay either directly or through the Special Fund.

Second, the assessments *are* indirect compensation. The Part B assessments are calculated based on how much the Special Fund paid out in the previous year to Matson employees. Matson then pays the required amount in, and, through the intermediate magic of fungibility and risk-sharing, amounts are paid to Matson's workers. That the assessments are indirect compensation from Matson finds some confirmation in the (undisputed) fact that LHWCA regulations allow Matson to "monitor" its workers' claims after they enter the Special Fund. *See* 20 C.F.R. § 702.148(b)-(c). "For purposes of monitoring these claims, employers . . . remain parties in interest to the claim and are allowed access to all records relating to the claim." 20 C.F.R. § 702.148(b). The employer can "investigat[e]" the cases of its Special Fund workers. 20 C.F.R. § 702.148(c). This may include, for example, requests for "earnings information . . . [,] periodic medical examinations, vocational rehabilitation evaluations, and . . . any additional information needed to effectively monitor" its employees' Special Fund cases. *Id.* Should a worker's situation change, so that they are no longer eligible for Special Fund benefits, the employer "can initiate [a]

proceeding to modify an award of [Special Fund] compensation." 20 C.F.R. § 702.148(b). This all reflects the fact that *Matson's* dollars are at stake. That, in other words, Matson is putting its money into the Special Fund to compensate its injured workers.

And although the parties disagree on this point — a disagreement whose minutiae outweigh its analytical impact — the LHWCA does treat at least some Special Fund assessments as "compensation." Section 933(c) of the LHWCA provides: "The payment of such *compensation* into the fund established in section 944 [the Special Fund] shall operate as an assignment to the employer of all right of the legal representative of [a] deceased" worker. 33 U.S.C. § 933(c) (emphasis added).

Third, the policy does not limit coverage to *direct* compensation. It does not limit coverage to payments that are in themselves compensation. The policy is slightly, but critically, more oblique. It covers losses sustained "*because of* . . . compensation" that the law requires of Matson. (*See* ECF 39-1 at 4 (emphasis added).) It is thus no answer to argue, as Century does, that the LHWCA "does not channel Matson's Special Fund Assessments to the 13 [Matson] Claimants on a dollar-for-dollar basis." (ECF No. 57 at 5.) The policy does not limit coverage to "dollar for dollar" compensation. (The policy could have included that limitation. It did not, however, and the court cannot effectively add such a limit to the policy now. *See, e.g., Powerine Oil Co. v. Superior Court of Los Angeles County*, 37 Cal.4th 377, 401 (2005) ("We will not rewrite the policies to insert a provision that was omitted.").) What the policy covers is money paid because the law required Matson to compensate its workers. Had its workers not enrolled in the Special Fund, then, again, Matson would have remained liable for paying them directly. The assessments that it paid to the Special Fund to achieve the same result were expenditures that Matson made "because of" its obligation to compensate its injured workers — either directly or through the device of the Special Fund. The Part B assessments arose, in other words, "because of . . . compensation" that Matson was "required" to pay "by the workers' compensation law."

* *

*__2. The assessments followed "adjudications"__*

The excess policy restricted coverage to Matson's "ultimate net loss." (ECF No. 39-1 at 4.) It defined "ultimate net loss" as "the sum actually paid in cash in the settlement or satisfaction of losses for which [Matson] is liable," as determined "by adjudication." (*Id.* at 5.) On that much the parties agree. Century contends that the Part B assessments were not incurred under an "adjudication" and so are not covered. (ECF No. 53 at 16-17; ECF No. 57 at 5.) Century's point seems to be that no DOL official calculated, "levied," and in those senses "adjudicated" Matson's actual yearly assessment: meaning, how much Matson owed the Special Fund in any given year. (*See* ECF No. 53 at 16.) "Rather, the DOL" merely "allocate[d] compensation responsibility between Matson (the first 104 weeks) and the Special Fund (after 104 weeks) . . . ." (ECF No. 53 at 16.)

This is too cramped an understanding of the DOL determinations that found the relevant Matson employees eligible for the Special Fund. It finds no support in the plain meaning of the term "adjudication," or in the language of the policy, and the logic by which it travels is unconvincing.

It required official determinations by the DOL to enroll a Matson employee in the Special Fund. *See* 20 C.F.R. § 702.321. (The determinations for the 13 Matson workers at issue appear at ECF No. 39-6 to -18.) The regulations that set out the procedures by which workers can be enrolled in the Special Fund require the employer to submit to the DOL's "deputy director" a "fully supported application" that "must be supported by medical evidence." 20 C.F.R. § 702.321(a)(1). If the evidence supports the employee's entry into the Special Fund, "the district director shall award such relief [*i.e.,* Special Fund compensation] after concurrence by the Associate Director, DLHWC,[5] or his or her designee." 20 C.F.R. § 702.321(c). If an employee is denied Special Fund compensation, an appeal of the denial "may be considered by an administrative law judge." *See id.* Nine of the thirteen determinations for the relevant Matson

---

[5] This being the U.S. Department of Labor, Division of Longshore and Harbor Workers' Compensation.

workers were indeed heard by administrative-law judges. (ECF No. 39-6- to -10, 39-14 to -16, 39-18.) These quasi-judicial determinations are "adjudications" within the normal compass of that term.[6] They are also "adjudications" fitting the apparent purpose of the policy's "ultimate net loss" clause, inasmuch as they ensure that the liability being passed on to Century is legitimately incurred under some official aegis. (And not the result of the insured's finagling its liabilities to pass to its excess insurer more "loss" than the latter has fairly contracted for.) Furthermore — and coming around to address Century's operative point — the DOL determinations are "adjudications" that causally triggered Matson's liability for Special Fund assessments. But for those official determinations, no Matson employee could have entered the Special Fund, and Matson would not be liable for Part B assessments. Those assessments are, in sum, losses for which Matson became "liable . . . by adjudication" within the meaning of the policy.

* *

### 3. The assessments were not "administrative expenses"

Century also argues that the Part B assessments are not covered because they are "administrative expenses" that Matson is charged as a self-insurer. (ECF No. 53 at 20.) The court disagrees. The assessments are not "administrative expenses" as that term is commonly understood; which is to say, as covering the typically incidental costs of "the management of any office, business, or organization."[7] The assessments go instead to *fund* "compensation and other benefits" to disabled workers. To deem the assessments "administrative expenses," of a sort that might not be covered, stretches the normal meaning of that term too far. Nor is it clear that the assessments would not be covered if they were "administrative expenses." The policy does not expressly exclude administrative expenses. (*See* ECF No. 39-1, *passim.*) Here, too, the policy could have excepted such expenses from coverage, but it did not, and the court cannot read such

---

[6] *See generally, e.g., Major v. Mem'l Hospitals Ass'n*, 71 Cal. App. 4th 1380, 1398 (1999) ("Generally speaking, . . . an adjudicatory act involves the actual application of . . . a [legal] rule to a specific set of existing facts." (citing *Strumsky v. San Diego County Employees Retirement Ass'n*, 11 Cal.3d 28, 35 (1974)).

[7] "Administration" definition, *Dictionary.com*, http://dictionary.reference.com/browse/administration (last visited May 1, 2015).

an exclusion into the policy. *Powerine*, 37 Cal.4th at 401. The argument that Century offers is an unpersuasive use of the term "administrative expenses" and an unreasonable interpretation of the policy.

* *

### 4. *That the Special Fund provides benefits to non-Matson employees*

Finally in this area, Century argues that the policy does not cover the Part B assessments because the Special Fund pays compensation and other benefits to non-Matson workers. (See ECF No. 57 at 6-7.) The only thing that the policy covered, Century insists, was compensation and benefits that Matson was legally required to "*Matson's own injured employees.*" (*Id.* at 7 (emphasis in original).)

This essentially complains that the indirectness of the Special Fund device precludes the Part B assessments from meeting the policy's coverage terms; it shares an error with Century's argument, discussed above, that those assessments are not "compensation" to Matson's injured workers. In this area, too, Century accurately points out that the Part B assessments "do not represent dollar-for-dollar 'compensation' to the 13 [Matson] Claimants" in issue. (*Id.*) The policy does not limit coverage to *direct*, "dollar for dollar" compensation. It could have included such a limitation, but it does not. The policy covers payments made "*because of . . .* compensation and other benefits" that workers'-compensation law "required" Matson to make. (ECF No. 39-1 at 4 (emphasis added).) The assessments fit that bill, even if they were channeled into the collective risk-sharing device of the Special Fund, so that Matson's payments could not be identifiably traced through to Special Fund disbursements to its own employees. *See DIL Trust v. Aetna Cas. & Sur. Co.*, No. 90-3664, slip op. at 6-7 (N.D. Cal. Sept. 4, 1991) (rejecting same argument) ("There is nothing in the language of the policies that requires that the benefits be paid directly to the employees, but only that it be money that [the insured] is legally obligated to pay for workers' compensation benefits.").

* *

## II. EVEN IF AMBIGUOUS THE POLICY WOULD COVER THE PART B ASSESSMENTS

The court does not think that the policy is ambiguous. Its plain language covers the Part B assessments. The basic interpretation that Century offers, however, is not facially unreasonable. The parties' competing interpretations therefore present the court with a contract that can perhaps be deemed ambiguous — or, at least, that should be considered through the lens of contractual-ambiguity rules. Under those rules, even if the policy is treated as ambiguous, the court must construe it to provide coverage. There are several ways in which Century finds the policy ambiguous; or in which it would bring extrinsic evidence to bear on how the court construes its coverage terms.

\* \*

### A. Expanded Statutory Liability After 1984

First, Century suggests that, when the parties contracted in 1979, they cannot have intended the policy to cover a liability (for Part B assessments) that did not exist until 1984. (*See* ECF No. 53 at 23-27, ECF No. 57 at 9-13.) The court does not agree that this is true as a matter of law. To the contrary. Accepting Century's argument on this point would require the court to depart from established California law. The California Supreme Court has indicated that policies can be read to cover statutory liabilities that arise after the policy is executed. That court has written: "Although our focus [in interpreting an ambiguous insurance policy] is the expectations of the insured at the time the policy is made, this emphasis does not preclude coverage of forms of liability — such as those at issue here — created after the formation of the policy." *AIU*, 51 Cal.3d at 822 n. 8. It may be "within the insured's reasonable expectation that new types of statutory liability would be covered, as long as they were within the ambit of the language used in the coverage provision." *Id.*

"[F]ailure to cover new liabilities," the *AIU* court observed,

> would create a "discordant result, for it would mean that where courts enlarge liability during the effective period of a liability policy, an insured who contracted for complete coverage of a possible risk would be left without coverage because the scope of the risk had been enlarged by decisional law." (*Travelers Ins. Co. v. Industrial Indem. Co.* (1971) 18 Cal. App. 3d 628, 632 [96 Cal. Rptr. 191].) *The same is true when legislatures create entirely new forms of liability*. The *sole relevant inquiry* in determining whether

such types of liability are covered is whether, in view of the **reasonable expectations of the insured, policy language can be interpreted to embrace the liability** that may accrue under new statutory schemes.

*AIU*, 51 Cal.3d at 822 n. 8 (emphases added).

Century contends that this rule does not apply because the 1984 LHWCA amendments (which added Part B assessments) "did not create a new form of liability." (ECF No. 53 at 27 (emphasis removed) (quoting and discussing *Nat'l Steel and Shipbuilding Co. v. Century Indem. Co.*, 959 F. Supp. 2d 1264, 1277 (2013) ("*NASSCO*").) This is particularly so, says Century, because the 1984 LHWCA amendments "did not increase Matson's obligation to pay compensation beyond 104 weeks." (ECF No. 23 at 27.) The 1984 amendments "only created a new formula for determining Special Fund assessments." (*Id.* (quoting *NASSCO*, 959 F. Supp. 2d at 1277).) The court finds unpersuasive Century's insistence on focusing only on the initial 104 weeks, when under both the pre- and the post-1984 LHWCA, Matson had an undeniable, additional obligation to pay into the Special Fund. More important — and with due respect to both Century and the *NASSCO* court — the court thinks that the 1984 amendments *did* expand Matson's Special Fund liability. An applicable regulation notes that the "amended assessment formula" imposed a "greater direct liability" on employers. 20 C.F.R. § 702.148(b). And as a matter of raw fact, facts to which both parties agree, Congress added Part B assessments so that employers who put workers into the Special Fund could no longer escape paying their fair share of Special Fund costs. The Part B assessments shut down a free-riding problem under the earlier law, and in this significant respect expanded the liability of employers who put workers into the Special Fund. This is a "new form[] of liability" within the scope of the *AIU* rule. It would be harder to countenance the opposite conclusion: that, having contracted to insure itself for excess losses prompted by legally required workers'-compensation payments, Matson would not have reasonably expected that coverage to omit "greater" liabilities simply because those liabilities were increased by a revised regulatory formula.

This 1980 Century policy promised coverage for compensation that "workers' compensation law" required Matson to make. Both parties are now and were then sophisticated entities; they must have known that the law changes and that, subject to constitutional limits, the moving law

leaves a jostling wake, one that can change everyone's position. It would have been reasonable for Matson to expect that this policy would cover its "compensation" obligations even if the law later changed the form and limits of those obligations.

* *

**B. The Parties' Negotiations**

The parties negotiated more than one aspect of the policy. For example, they negotiated over Part II of the policy's core "Insuring Agreements." The latter section contains the "ultimate net loss" limitation that requires covered compensation payments to be made pursuant to an "adjudication." (ECF No. 39-1 at 4.) Though, again — and significantly — the "adjudication" requirement comes, not from within the Insuring Agreements, but from the policy's separate "Definitions" section. (*See* ECF No. 39-1 at 4-5.) Century proposed an amended version of Insuring Agreements – Part II, but Matson rejected it, and the parties fell back on Century's standard-form terms that appear in the final policy. (*See* ECF No. 54-1 at 2-4 (correspondence reflecting negotiations); ECF No. 53 at 12 ("the insuring agreement . . . used form language"). There is no evidence that the parties negotiated *Part I* of the Insuring Agreements. Part I is the section that contains the basic coverage terms that this opinion has been considering: "loss," and "because of . . . compensation and other benefits required . . . by the workers' compensation law." (ECF No. 39-1 at 4.)

That the parties negotiated policy terms means (in Century's view) that certain familiar rules of contract construction do not apply; specifically, the rules that ambiguous terms are construed against the drafting party, and, more generally, that insurance policies are broadly construed to afford coverage. (*See* ECF No. 57 at 8-10.)

"There is some force in these arguments." *AIU*, 51 Cal.3d at 823. It is true that Matson was a sophisticated actor and that the parties in some respects (and at no small length) negotiated the policy's terms. Nevertheless, Century's depiction of the parties' negotiation is too imprecise, as is its view of California law. The parties did not negotiate *the policy terms that are in question*. They did negotiate the section that contains the "ultimate net loss" term; but it is unclear whether they negotiated the *definition* of "Ultimate Net Loss," which appears in another part of the policy, and

from which the "adjudication" requirement derives. (*See* ECF No. 54-1 at 2-4.) It further appears that, once Matson rejected Century's proposal to use an amended Part II of the Insuring Agreements, the parties fell back upon Century's standard terms. (*See* ECF No. 53 at 12 ("the insuring agreement . . . used form language").)

The Supreme Court of California has illustrated how a court should resolve such a situation. In *AIU*, too, the insurer argued (and the California high court agreed) that the insured company possessed "both legal sophistication and substantial bargaining power." *AIU*, 51 Cal.3d at 823. Because there was no proof that the parties had negotiated the precise terms in dispute, however, the usual interpretive rules would apply. The court thus construed the policy against the insurer (the drafter) and in favor of coverage. *Id.* at 823-24. The *AIU* court wrote:

> In the absence of evidence that the parties, at the time they entered into the policies, intended the ***provisions at issue*** here to carry technical meanings and implemented this intention by ***specially crafting policy language***, however, we see little reason to depart from ordinary principles of interpretation. Similarly, in the absence of evidence that the insurers had cause to believe, at the time of formation, that [the insured] understood policy language in any technical or restrictive manner, we decline to depart from the settled rule that ambiguities are resolved against the party responsible for their inclusion in the policies.
>
> We deem this party to be the insurers. They have presented no evidence suggesting that the ***provisions in question were actually negotiated or jointly drafted***.

*Id.* (emphases added). The insurer in *AIU* had "submitted evidence" that "the policies were written on a line-per-line basis through continuing negotiation with the insurance carrier," so that the insurer "individually negotiated the policies in question." *Id.* at 823 n. 9. This did not change matters:

> This evidence does not . . . shed light on the meaning to be ascribed to the ***coverage provisions at issue here***. These provisions, as we have noted above, ***are adopted verbatim from standard form policies*** used throughout the country. For this reason, even if the policies were "negotiated" in a broad sense, this fact has little bearing on construction of the specific policy language in question here.

*Id.* (emphases added).

Given this law, and the evidence that Century has submitted about the parties' negotiations, the court finds no proof that any of the policy's operative terms — all those terms appearing in

Part I of the Insuring Agreements section ("loss," and "because of" through "workers' compensation law"); and the definition of Ultimate Net Loss that carries the "adjudication" requirement — were negotiated. The court must therefore construe those terms against Century and broadly in favor of coverage.

* *

### C. Course Of Performance

Last in this area, Century argues that the long delay between 1984 and Matson's claims in 2013 shows that the parties could not have intended to cover Part B assessments when they entered their contract in 1979. (ECF No. 53 at 17-19.) Had Matson understood the policy to cover Part B assessments, Century's reasoning goes, it would have made a claim a long time ago. Matson responds with a rather technical discussion of the difference between "course of performance" and "course of dealing" in contract law. (ECF No. 55 at 21-22.) If useful for clarifying the terms in play, in the court's respectful estimation, this discussion does not helpfully speak to Century's essential point.

That said, the court finds neither party's "course of performance" argument decisive. On this point, then (to use an unfortunately dusty term), the court finds itself in equipoise. The court understands Century's point. It is not without suggestive value. But Matson has offered a facially plausible explanation for the delay. At the hearing, Matson explained that, until relatively recently, it lacked systems that tracked the Part B assessments. It has also persuasively argued that Century cannot have been prejudiced by the delay, because it will be able to discharge its obligations under the policy "in today's depreciated dollars." (ECF No. 55 at 22-23.) The rule set down in *AIU* also prevents the court from finding as a matter of law that the parties could not have intended the policy to cover liabilities (like the Part B assessments) that arose under later statutory amendments. Indeed, given the policy's language, *AIU* almost compels the conclusion that covering such expanded liabilities was within Matson's "reasonable expectation" at the time of contracting. Nothing else in the record nudges the court to come down one way or the other on this subsidiary issue.

* * *

# III. STATUTE OF LIMITATIONS: TIME STARTED TO RUN WHEN CENTURY DENIED MATSON'S CLAIM

Century also argues that Matson's breach-of-contract claim is time-barred. (ECF No. 53 at 30-31.) The facts relevant to the parties' limitations arguments are undisputed. "The application of the statute of limitations on undisputed facts is a purely legal question." *Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal.4th 1185, 1191 (2013).

The applicable statute of limitations is four years. Cal. Civ. Pro. § 337. Under California law, "[t]he limitations period . . . runs from the moment a claim accrues." *Aryeh*, 55 Cal. 4th at 1191 (citing, *inter alia*, Cal. Civ. Pro. § 312). A "cause of action accrues when [it] is complete with all of its elements — those elements being wrongdoing, harm, and causation." *Id.* (quotation omitted). "This is the 'last element' accrual rule: ordinarily, the statute of limitations runs from 'the occurrence of the last element essential to the cause of action.'" *Id.* (quoting in part *Neel v. Magana, Olney, Levy, Cathcart & Gelfand*, 6 Cal.3d 176, 187 (1971) (citing cases)). A breach-of-contract claim, in particular, "*does not accrue before the time of breach*." *Romano v. Rockwell Int'l, Inc.*, 14 Cal. 4th 479, 488 (1996) (citing cases) (emphasis added). Consequently, "[t]here can be no *actual* breach of a contract until the time specified therein for performance has arrived." *Id.* (quoting *Taylor v. Johnson*, 15 Cal. 3d 130, 137 (1975)) (emphasis in original).

Though this policy dates from 1980, and Part B assessments from 1984, Matson argues that its claim did not accrue until 2013, when Century denied its claims for coverage, and thereby allegedly breached its agreement. (ECF No. 55 at 28-29.) Before then (in Matson's view), there was no breach, no complete claim, and no accrual to trigger the statute. Century counters that the statute started to run, at the latest, by 1991, when the first of the 13 Matson claimants pierced the policy's $250,000 self-insurance limit, thus potentially triggering excess coverage under the policy. (ECF No. 53 at 30-31.) Allowing Matson to bring claims now, more than 30 years after the policy was executed, is, in Century's view, "absurd." (ECF No. 57 at 17.)

First, Century's argument conflates a "claim" under the insurance policy with a "claim" for breach of contract. The former is what Matson might have known the essential facts of by 1991. (*See* ECF No. 53 at 31.) The latter, which is the "claim" that is in question here, was not complete

and so did not accrue until Century denied the policy claim in 2013.

The court agrees with Century that in this case the accrual rule yields an unusual, striking, maybe even troubling result. Claims this long in gathering are usually stale, even under rules of repose. However unusual, though, California limitations law indicates that Matson's breach-of-contract claim did not accrue until 2013. The oddness of this result does not permit the court to ignore the established rules of accrual. It may indicate that Century's delay-based arguments must take other forms: as shedding light on the parties' intent at the time of contracting (an argument that Century has made in its "course of performance" discussion); perhaps as laches; or as the late-notice defense that Century suggests that it will develop through discovery (*see* ECF No. 53 at 25 n. 9). The statute of limitations, though, has not run.

* * *

## IV. ANALOGIES

Finally, the court considers two cases whose antipodal decisions (in the face of essentially the identical question presented here) the parties cite in favor of their respectively desired outcomes. Matson urges the court to follow *DIL Trust v. Aetna Cas. & Sur. Co.*, No. 90-3664 (N.D. Cal. Sept. 4, 1991), in which the court held that an excess policy covered Part B assessments. Along the way, the *DIL Trust* court rejected several of the arguments that Century makes for denying coverage here. For its part, Century invokes *Nat'l Steel and Shipbuilding Co. v. Century Indem. Co.*, 959 F. Supp. 2d 1264 (2013) ("*NASSCO*"). The *NASSCO* court held that a Century excess policy did not cover Special Fund assessments, rejected arguments that Matson presents here, and also held that the insured's claims were untimely.

### A. *NASSCO*

The Century policy at issue in *NASSCO* was effectively identical to the one involved here. That policy, too, committed Century to covering excess losses that the insured sustained "because of . . . compensation and other benefits required by the Workers' Compensation Law." *NASSCO*, 959 F. Supp. 2d at 1271. The policy also contained the same Ultimate Net Loss terms as the Century–Matson policy. *See id.* at 1271-72. The insured in *NASSCO* sought coverage for Part B assessments. *See id.* at 1277. The *NASSCO* court acknowledged that "the 1984 amendments" that

created those assessments "created a direct correlation between Special Fund benefits paid to an employer's injured workers during one year and that employer's Special Fund assessment the subsequent year." *Id.* at 1268. Nevertheless, the court concluded that Part B assessments "do not fall within the literal and unambiguous terms of the Policy." *Id.* at 1278.

This court respectfully disagrees with several parts of the *NASSCO* decision. First, that decision held that the assessments were not covered as "compensation" under the policy primarily because they did not embody payments "directly" to the insured's injured workers. The assessments were not (the *NASSCO* court reasoned) "dollar-for-dollar" compensatory payments that the insured had to pay "to a specific employee for a specific injury." *Id.* at 1275, 1277. This court has already suggested why it disagrees with that analysis: The Century policy does not expressly or impliedly require that covered losses be "direct" payments to injured workers. The policy instead covers losses sustained "*because of*" compensation that the LHWCA "required" Matson to pay. This court thinks that that is the effect that the policy's plaIn language demands. To read a "direct payment" condition into the policy would be to judicially insert something into the policy that is not there. Because the policy's plain language covers the Part B assessments that Matson's statutory compensation obligation "required" it to pay, there is no room for an interpretive amendment to the policy.

The *NASSCO* court also held that the DOL "administrative orders" that entered the insured's workers into the Special Fund did not constitute "adjudications" within the meaning of the policy's Ultimate Net Loss term. *NASSCO*, F. Supp. 2d at 1273-74. Like Century, *NASSCO* reasoned that the yearly assessments were not calculated and levied by an "adjudication," and that the insurer's obligation to pay Special Fund assessments for its relevant employees flowed, not from the DOL "administrative orders," but from the LHWCA. *See id.* at 1274. With that conclusion, for the reasons already given, the court respectfully disagrees.

This court moreover does not agree that the Part B assessments can be rightly deemed "administrative expenses." *See id.* at 1276-77. The *NASSCO* court decided that the assessments were such expenses partly because the assessments did not go "to a specific employee for a specific injury." *Id.* at 1277. But, again, the policy contains no such condition. Effectively adding

that condition needs a judicial editing of the policy that California law does not permit.

Finally, the court agrees with Matson's suggestion that, although it nominally rested its decision on the policy's "literal and unambiguous terms," *id.* at 1278, *NASSCO* reaches its subsidiary and ultimate conclusions on the back of judicial interpretation *away from* the policy's plain language. Maybe the most that can be said in this regard is that this court also sees a conclusion flowing from the policy's plain language — so that there is no room for judicial interpretation (to resolve ambiguities or insinuate new policy terms) — but that this court's conclusion is different from *NASSCO*'s.

\* \*

**B. *DIL Trust***

The court agrees with the reasoning and conclusion reached in *DIL Trust*. The excess policy in that case covered amounts ("losses") that the insured paid "[a]s compensation and other benefits required . . . by the Workers' Compensation Law." *DIL Trust*, slip op. at 2. The *DIL Trust* court found that this language covered Part B assessments. *Id.* at 5-11. It thus granted summary judgment for the insured.

Several aspects of *DIL Trust* are relevant to this case. First, the *DIL Trust* court held that the policy, which first became effective in 1979, could reasonably be interpreted to cover Part B assessments that came into existence in 1984. The *DIL Trust* court followed *AIU, supra*, in this respect. *DIL Trust*, slip op. at 9-10.

Second, *DIL Trust* rejected the idea that Special Fund assessments were uncovered "claims expenses" even though "a portion of the money is used . . . to pay administrative expenses of the Fund." *See id.* at 8. The *DIL Trust* policy expressly excluded "claims expenses" from the definition of "loss" and made such expenses "compensable [only] on a prorated basis." *Id.* at 2-3, 8. The policy also defined "claims expenses." *Id.* at 2, 8. The *DIL Trust* court found that the assessments did not meet the policy's definition of "claims expenses." *Id.* at 8. (In a related vein, *DIL Trust* also rejected the insurer's characterization of Special Fund assessments as an uncovered "tax." *Id.* at 8-9. The court reasoned that he assessments "are more properly seen as replacements for tort awards," which the policy "undeniably covered." *Id.* at 9.)

In all this, *DIL Trust* indirectly suggests that Part B assessments are not "administrative expenses" that this court can interpretively remove from coverage. The Century–Matson policy does not exclude "administrative expenses." (*See* ECF No. 39-1, *passim*.) Presumably for that reason, it does not define such expenses. (*Id.*) If characterizing Part B assessments as uncovered ministerial costs was unconvincing in the *DIL Trust* context — where the policy expressly addressed such expenses — then that same argument wields still less suasion here.

Third, like Century, the insurer in *DIL Trust* argued that Part B assessments were not covered compensation because the payments were channeled through an indirect device (the Special Fund) that also disbursed money to non-DIL workers. *Id.* at 6-7. The court rejected this argument, calling the Special Fund a "trust" that indeed directed compensation to injured DIL workers. *Id.* "That the money is first channeled through a central government trust," the court held, "does not change the fact that the money used is the 'amount actually paid by the Insured in payment of benefits under the workers' compensation law . . . .'" *Id.* at 7.

Century views this as a major flaw in *DIL Trust's* reasoning. That decision, Century says, is "based on the faulty legal premise . . . that the Special Fund operates as a clearinghouse, pass-through, or conduit . . . ." (ECF No. 53 at 28.) Century points out that *NASSCO*, too, rejected this depiction of the Special Fund. Unlike a true clearinghouse, Century argues, the Special Fund does not redirect Matson's Part B assessments to its own injured workers on a "dollar for dollar" basis. (*Id.* (citing *NASSCO*, 959 F. Supp. 2d at 1275.)

The court does not agree. The *DIL Trust* court's point is that Part B assessments were covered even if they passed through an intermediate device — whether that is labeled "trust," "risk-sharing mechanism," or "clearinghouse" — and this conclusion holds even if "clearinghouse" is not the most precise description. (*DIL Trust* did not use the term "clearinghouse." It called the Special Fund a government "trust" — which is the word that the Fund's generative statute uses. *DIL Trust*, slip op. at 6-7; *see* 33 U.S.C. § 944.) The *DIL Trust* court dealt with the *principle* involved: namely, whether the policy covered only direct compensation to the insured's employees, or whether it also covered payments that are channeled through a trust and ultimately paid to both the insured's and other companies' workers. *See DIL Trust*, slip op. at 6-7. The *DIL Trust* court found

that the policy at issue did not require direct, dollar-for-dollar payments. *Id.* It covered losses "[a]s compensation . . ." that the insured was "legally obligated to pay." *Id.* at 7.

An identical conclusion applies here. If anything, the policy's coverage term in this case is broader. Where the *DIL Trust* policy covered amounts paid "*[a]s* compensation," the Century policy covers amounts paid "*because of . . .* compensation" that the law required Matson to pay. The term "because of" introduces into the Century policy a degree of removal between payment (from Matson) and compensation (to workers) that, at least in this context, extends the coverage range of the Century policy. As in *DIL Trust*, Century's "reading . . . would require the Court to insert language to the effect that only *direct* benefit payments are compensable. Such a reading would be contrary to the direct interpretation of the language in the polic[y] . . . and will not be adopted by the Court." *Id.*

The few other grounds that Century offers to distinguish *DIL Trust* (ECF No. 53 at 27-28) do not persuade.

\* \* \*

## V. SUMMATION — A STRANGE RESULT

An overarching concern bolsters this decision. Had Matson paid benefits directly to its injured workers, rather than paying for compensation to those workers through Part B assessments to the Special Fund, there is no doubt that the Century policy would have covered Matson's outlays. The parties do not seem to dispute that. This has a striking implication. In effect, as Matson correctly writes, Century "asks the Court to adopt an . . . interpretation under which [Century] would be liable for Matson's losses if Matson had continued to pay the lifetime compensation required by the LHWCA *directly* to the thirteen claimants, but [in which Century] gets to escape coverage entirely because Matson *satisfied and mitigated its liability* under the LHWCA by enrolling these employees in the Special Fund." (ECF 55 at 5 (emphasis in original).)

The *DIL Trust* court found this position, when taken by Aetna Casualty and Surety Company, to be "logically inconsistent":

> Aetna would require DIL [the insured] to be penalized for
> attempting to limit its liability — and, by extension, Aetna's liability
> — by utilizing the Special Fund. Aetna does not dispute that if DIL

> had bypassed the Special Fund and paid full compensation directly to the employee, then the full amount of compensation would be covered as a loss. Therefore, responsibility for the increased liability rests with the insurer, not the insured.

*DIL Trust*, slip op. at 10.

If the law yields the conclusion that Century wants, then the practical upshot is as strange as Matson suggests, and in just the way that Matson suggests. The *DIL Trust* court reached the same conclusion. *See id.* The legal conclusion must be that Part B assessments constitute "compensation or other benefits," and are therefore "losses," within the meaning of the policy. This is consistent with California contract law, as this discussion has tried to show. The contrary result is untenable.

\* \* \*

## CONCLUSION

The court grants the Matson defendants' motion for partial summary judgment on the issue of coverage and denies Century's crossing motion for summary judgment. This disposes of ECF Nos. 38 and 53.

**IT IS SO ORDERED.**

Dated: May 12, 2015

_____
LAUREL BEELER
United States Magistrate Judge